IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Ardella Sper, )
)
       Plaintiff, ) Case No. 1:13-CV-251
)
vs. )
)
Judson Care Center, Inc., )
)
       Defendant. )

**O R D E R**

This matter is before the Court on Defendant Judson Care Center, Inc.'s motion for summary judgment (Doc. No. 24). For the reasons that follow, Defendant's motion for summary judgment is well-taken and is **GRANTED.**

I. Background

Plaintiff Ardella Sper presents claims against her former employer, Defendant Judson Care Center, Inc. ("Judson"), alleging that Judson violated the Americans With Disabilities Act ("ADA") and the Ohio Civil Rights Act ("OCRA") by terminating her employment because of her disability and by not providing a reasonable accommodation for her disability. Additionally, Plaintiff alleges that Judson interfered with her rights under the Family Medical Leave Act ("FMLA") by not granting her leave to address a serious health condition.

Judson is a nursing and rehabilitation facility that provides long-term care to its patients. Plaintiff, a registered nurse, began working for Judson in October 2010 as a charge nurse. As a charge nurse, Plaintiff was responsible for the patients in her unit, as well as for supervising the State Trained Nursing Assistant's ("STNA's"). Plaintiff

testified that her job duties consisted of giving patients their medications, performing treatments, keeping patients' family members updated, communicating with doctors and coordinating patient care with other staff members.  Plaint. Dep. (Doc. No. 15), at 43.  Plaintiff was also required to keep accurate records on medications.  Id. at 46.  At the relevant time in this case, Plaintiff worked the 7:00 p.m. to 7:00 a.m. shift.

Plaintiff was diagnosed with trigeminal neuralgia ("TN") in July 2010.  Plaint. Dep. at 25, 193.  TN is a condition that produces "[i]nflammation of the trigeminal nerve (the fifth cranial nerve) that most commonly causes paroxysms of very intense lightning pain in the areas of the face the nerve supplies -- the lips, eye, nose, scalp, forehead, gums, cheek, and chin -- on the involved side of the face."  See Definition of Trigeminal Neuralgia, available at http://www.medterms.com/ script/main/art.asp?articlekey=26023 (visited June 27, 2014).  Plaintiff's diagnosing physician, Dr. Goldenberg, originally prescribed Tegretol twice a day to control her symptoms.  Plaintiff testified that when she has a flare-up, she is limited in eating, talking, breathing from her mouth, and doing anything that takes concentration.  Plaint. Dep. at 20.  Plaintiff also testified, however, that these flare-ups last for only about 20 minutes, even without medication, and that TN only caused her to miss four or five days of work in the approximately two years she was employed by Judson.  Plaint. Dep. at 16-17, 20, 23-24.  Plaintiff's deposition indicates that her TN is well-controlled on medication and that TN does not impose any significant restrictions on her ability to care for herself or her daughter or on her activities of daily living.  Id. at 17-20.  Plaintiff testified that she even discontinued using Tegretol in December 2010 and throughout 2011 after she used up her prescription but was no longer having any symptoms. Id. at 197-98.

2

In February 2012, suspicions that nurses were diverting drugs caused the Ohio Pharmacy Board and the Cincinnati Police Department to review Judson's procedures for disbursing narcotics.  Prior to the review, nurses had a practice of "late entering" the required information in the medications logs - they would administer the drug to the patient and complete the paperwork afterwards.  After the review, however, Judson implemented a strict policy which required nurses to complete the Controlled Drug Log ("CDL") when they removed a narcotic from the drug cart and then complete the Medication Administration Record ("MAR") when the drug was given to the patient. Weber Aff. (Doc. No. 16-1) ¶¶ 4-7.  Additionally, the outgoing and incoming charge nurses were required to audit the drug cart at the change of a shift to make sure that the count was correct.  Plaint. Dep. at 51-52.

Plaintiff had several disciplinary warnings issued to her while she was employed by Judson.  In August 2011, Plaintiff received a verbal warning for not removing two NTG patches from a patient. Doc. No. 15-1, at 50.  In February 2012, Plaintiff received a verbal warning for not completing an in-house training program.  Doc. No. 15-2, at 1.  In June 2012, Plaintiff received a written warning for improper conduct.  Doc. No. 15-2, at 2.  Specifically, Plaintiff was cited for permitting aides to leave the assisted living ward for an extend period of time, which left the unit unattended, and for attending to personal matters during her shift.  Doc. No. 15-2, at 2-3.  In July 2012, Plaintiff received a final written warning for administering medication to a patient without a valid physician's order to do so.  Doc. No. 15-2, at 7.  Plaintiff testified that she understood that after receiving this last warning, one more infraction would result in her termination. Plaint. Dep. at 88-89.

3

Plaintiff began treating with Dr. Thomas Myers in April or May 2012 for back pain and anxiety, and possibly for TN. Plaint. Dep. at 127-28. Dr. Myers originally prescribed Neurontin for back pain and Ativan for anxiety. Plaintiff was not sure whether Dr. Myers prescribed anything for TN at that time. Id. at 128-29. Dr. Myers changed Plaintiff's prescriptions on August 20, 2012. He discontinued Neurontin at Plaintiff's request and started her on Tramadol for back pain. Dr. Myers continued Ativan but started Plaintiff on Tegretol again. Id. at 129-30.

Most of what happened next is not disputed. During her shift on August 22-August 23, Plaintiff was impaired at work, although it is not clear whether she arrived at work impaired or became impaired later in her shift.[1] In any event, at around 3 a.m., an aide in Plaintiff's unit reported to Nic Nzisabira, a charge nurse on another floor, that Plaintiff was acting strange and asked him to come over right away. Nzisabira Dep. (Doc. No. 19), at 35. Nzisabira found that Plaintiff was unsteady on her feet and kept asking for "Jim." Contemporaneous incident reports describe Plaintiff as having slurred speech, being incoherent and disoriented, swaying and staggering, being unable to stay awake, and having her eyes roll back into her head. Doc. No. 20-1, at 23-31.

Plaintiff told Nzisabira that she was not feeling well and wanted to go home. Nzisabira started to do a count of the medications in Plaintiff's cart but she slumped over and hit her head on the cart. Id. at 35-36. Nzisabira called another nurse to complete a cart count and they soon discovered discrepancies. They first noticed that

---

[1] Plaintiff thinks she arrived at worked impaired; Judson contends that she was not impaired until later on. The actual time Plaintiff became impaired, however, is not crucial to the disposition of Judson's motion.

even though it was 3:00 a.m., Plaintiff had signed out some medications that were not supposed to be administered until 6:00 a.m. Additionally, they found one unaccounted-for pill each of Oxycodone, Hydrocodone, Tramadol, Clonazepam, and Morphine. Weber Dep. at 110-11, Weber Dep. Ex. 54. Plaintiff conceded in her deposition that she did not follow the established protocol for distributing these drugs and that she does not know whether she gave these drugs to the appropriate patient, whether she took them herself, or whether she misplaced them. Plaint. Dep. at 109-110, 137-38, 140.

Nzisabira called Bridgid Weber, the director of nursing, for instructions when they discovered the discrepancies in Plaintiff's cart. Nzisabira Dep. at 38-40. Weber told Nzisabira to call 911 so Plaintiff could be taken to the hospital and also to make sure the hospital gave Plaintiff a drug test. Nzisabira Dep. at 47-48 Plaintiff, however, became agitated when she learned that Nzisabira called 911 and refused to be transported to the hospital by the emergency medical technicians. Id. Plaintiff testified that she did not want to be taken to the hospital by the emergency squad because she did not want to pay for the cost of an ambulance run. Weber Dep. at 108-09, 119-20; Weber Dep. Ex. 53. Plaintiff requested instead that Nzisabira call her mother to pick her up. Nzisabira called Plaintiff's mother and, when she arrived, told her that she needed to take Plaintiff to the hospital and that she needed to take a drug test. Id. Plaintiff's mother, however, took her home instead. Plaint. Dep. at 110.

Weber spoke to Plaintiff on the phone on the afternoon of August 23 and instructed her to go to the hospital for a drug test. During the conversation, Plaintiff told Weber that the incident was caused by a reaction to a new drug she had been prescribed. Weber Dep. at 128.

Plaintiff attributed her impairment at work to taking her prescriptions for Ativan, Tramadol, and Tegretol at the same time two hours before her shift began. Plaint. Dep. at 92; Doc. No. 15-2, at 11. Plaintiff also provided Judson with a note from Dr. Myers which stated that her reaction that night "could have been" caused by effects of a new prescription. Doc. No. 15-2, at 9. The results of Plaintiff's drug test showed Ativan, Tramadol, Tegretol , and Doxylamine, an over-the-counter antihistamine. Plaint. Dep. at 134-35. Other than Tramadol, however, for which she had a prescription, Plaintiff did not test positive for any of the other missing drugs. Id. at 134. Despite the severe reaction that Plaintiff had on the evening of August 22-23, she continued to take the same three medications until she saw Dr. Myers again on August 29. Plaint. Dep. at 119-20. Plaintiff also testified that she has no memory of any of the events that occurred on the night in question.

On September 6, 2012, Judson terminated Plaintiff for violating its policy concerning documenting the distribution of narcotics. Doc. No. 15-2, at 10.

Plaintiff filed a timely complaint of disability discrimination with the EEOC and received a right-to-sue letter in February 2013. Plaintiff filed the instant lawsuit in April 2013 alleging that Judson discriminated against her on the basis of disability in violation of the federal Americans With Disabilities Act and the Ohio Civil Rights Act. She also alleges that Judson interfered with her rights under the Family Medical Leave Act. Following the close of discovery, Judson filed a motion for summary judgment on each of Plaintiff's claims which is now ripe for disposition.

II. Summary Judgment Standard of Review

6

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers. The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other

words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250. "If the evidence is merely colorable, . . . or is not significantly probative, . . . the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

### III. Analysis

#### A. Disability Discrimination

##### 1. Disparate Treatment

As already stated, Plaintiff alleges that Judson violated the Americans With Disabilities Act and the Ohio Civil Rights Act by discharging her because of her disability, by not accommodating her disability, and by not engaging in the interactive process to find an accommodation for her disability. The Court first notes that disability discrimination claims under the ADA and OCRA can be analyzed together because they use the same evidentiary standards. Brenneman v. MedCentral Health Sys., 366 F.3d 412, 418 (6th Cir. 2004). The alleged discriminatory acts in this case occurred after January 1, 2009; therefore the ADA Act Amendments Act of 2008 ("ADAAA") applies in this case. Milholland v. Sumner County Bd. of Educ., 569 F.3d 562, 566-67 (6th Cir. 2009).

In order to establish a claim for disability discrimination, the plaintifff must first establish that she is "disabled" within the meaning of the Act. McKay v. Toyota Motor Mfg., U.S.A., Inc., 110 F.3d 369, 371 (6th Cir. 1997).

> Under the ADAAA, "disability" means:
>
> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

8

>    (B) a record of such an impairment; or
>
>    (C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1).

Once the plaintiff establishes that she is disabled under the Act, she can prove a disability discrimination claim through direct or circumstantial evidence. Rorrer v. City of Stow, 743 F.3d 1025, 1038 (6th Cir. 2014) (direct evidence); Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1047 (6th Cir. 1998) (circumstantial evidence). "[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003). An ADA plaintiff must prove that she would not have been terminated "but for" the employer's reliance on her disability. Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 321 (6th Cir. 2012) (en banc)

If the plaintiff has direct evidence that the employer relied on his or her disability in making an adverse employment decision, or the employer admits it relied on the plaintiff's disability, then a burden-shifting analysis applies. Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1186 (6th Cir. 1996), abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 315–16 (6th Cir. 2012) (en banc). First, the plaintiff must establish a prima facie case by showing that she is disabled and otherwise qualified for the position, either with or without reasonable accommodation. Keith v. County. of Oakland, 703 F.3d 918, 923 (6th Cir. 2013). Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to

show that accommodating the plaintiff would impose an undue hardship on the operation of its business. Id.

Plaintiff contends that she has direct evidence that Judson terminated her because of her disability. Plaintiff's argument proceeds as along these lines. First, in considering whether a person is disabled under the ADA, the district court must consider the negative side effects of any medications the plaintiff is taking. Cf. Sutton v. United Air Lines, Inc., 527 U.S. 471, 484 (1999), overruled in part by 42 U.S.C. § 12102(4)(E). Second, Plaintiff notes that the record shows that she was impaired on the night of August 22-23 due to the side effects of the medication she takes for TN and that her failure to properly document the distribution of narcotics was caused by her medication. Third, Judson admits it terminated her because she failed to properly document the distribution of narcotics. Fourth, because her failure to document the distribution of narcotics was caused by the side effects of her medication, her conduct and her disability cannot be separated. Fifth, therefore, according to Plaintiff, she has direct evidence of disability discrimination because Judson admits that it terminated her for conduct related to her disability. In other words, Plaintiff contends that firing an employee because of misconduct related to her disability is terminating an employee because of her disability. Cf. Teahan v. Metro-North Commuter R. Co., 951 F.2d 511, 516-17 (2nd Cir. 1991).

Assuming that she is disabled under the ADA - a point which Judson disputes - the problem with Plaintiff's syllogism is that it has been squarely rejected by the Sixth Circuit. So long as the employee's misconduct is related to the performance of her job, an employer may discipline or terminate the employee even if her misconduct was

10

caused by her disability. Macy v. Hopkins County Sch. Bd. of Educ., 484 F.3d 357, 366 (6th Cir. 2007) abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 315–16 (6th Cir. 2012) (en banc); Brohm v. JR Prop., Inc., 149 F.3d 517, 521 (6th Cir. 1998); Maddox v. University of Tenn., 62 F.3d 843, 847 (6th Cir. 1995) abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 315–16 (6th Cir. 2012) (en banc); Chandler v. Specialty Tires of Am. (Tenn.), Inc., 134 Fed. Appx. 921, 928-29 (6th Cir. 2005).

In this case, assuming that Plaintiff's failure to follow the established narcotics distribution protocol was caused by the side effects of her medication, and hence was caused by her disability, this misconduct was clearly related to the performance of her job. Plaintiff admitted in her deposition that she was impaired at work, was in no condition to treat patients, and has no idea what happened to the medication. Plaint. Dep. at 106, 176  Indeed, as mentioned above, Plaintiff has no idea whether she gave the medication to the right patients or not. It hardly needs to be said that someone in Plaintiff's condition that night would be disqualified from safely performing her job as a nurse.

Brohm is instructive and is materially indistinguishable from this case. Brohm involved an anesthesiologist whose obstructive sleep apnea caused chronic sleep deprivation which in turn caused him to fall asleep during surgical procedures. Brohm, 149 F.3d at 519. The hospital administration decided to terminate the plaintiff's employment contract when it learned that he was sleeping during procedures. The plaintiff informed the hospital that he thought his problem was caused by sleep apnea and set up a sleep study before his scheduled termination date. The hospital eventually

terminated the plaintiff before the scheduled date.  The sleep study confirmed that the plaintiff had obstructive sleep apnea but that it was controlled and would not interfere with his job performance if he used a CPAP mask during sleep.  Id. at 519-20.

The plaintiff later sued the hospital for disability discrimination, arguing that he was fired because of his sleeping impairment.  As in this case, the plaintiff argued that the hospital fired him "because of" his disability when it fired him for misconduct that was caused by his disability.  Id.  at 521.  The Court, however, rejected the plaintiff's argument, noting that prior precedent had established that an employer may terminate an employee for job-related misconduct that was related to the employee's disability. Id. With respect to the particular facts of the plaintiff's case, the panel commented that:

> Brohm's conduct of sleeping while administering anesthetics severely diminished his ability to perform his job. . . . [N]o reasonable inference may be made from the record in the present case that the hospital unfairly presumed that Brohm's disability would render him unqualified.  Rather, the hospital had direct evidence that Brohm had been sleeping on the job, conduct which rendered him unqualified to perform his duties as an anesthesiologist.

Id.

Similarly, in this case, Plaintiff's medications caused her to be unfit to treat patients on the night at issue.  Moreover, similar to the hospital in Brohm, Judson had direct evidence that Plaintiff failed to comply with its directives for the safe and controlled distribution of medications to patients, a job duty that Plaintiff admitted was a critical aspect of her job.  Plaint. Dep. at 46; 49, 52-53; 61.  Thus, like the anesthesiologist in Brohm, Plaintiff's impaired condition and her failure or inability to comply with the procedures to properly distribute controlled substances made her unqualified to perform her job.  Moreover, Plaintiff's violation of Judson's documentation

policy came on the heels of a previous disciplinary action which she understood to be a final warning before she was terminated.  Consequently, the record is clear that Judson appropriately terminated Plaintiff for job-related misconduct related to her disability but not "because of" her disability.  In other words, Plaintiff has not adduced direct evidence that Judson terminated her because of her disability.

Moreover, Plaintiff's impairment on August 22-23 arguably <u>was not</u> caused solely because of the side effects of Tegretol, and therefore, her misconduct was not caused by her disability.  Prior to August 22, 2012, Plaintiff apparently took Tegretol for her TN without experiencing side effects which adversely affected her job performance.  On the night in question, however, Plaintiff took a combination of Tegretol, Ativan (Lorazepam), and Tramadol, each of which alone can cause dizziness, sedation, and/or somnolence according to Physician's Desk Reference, but the side affects of these drugs would be exacerbated when combined with other drugs that affect the central nervous system.[2]  Plaintiff was taking Ativan for anxiety and Tramadol for pain; however, she does not claim any impairment based on anxiety and back pain.  Therefore, the most reasonable conclusion is that Plaintiff's misconduct on August 22-23, 2012 was not caused by her disability but rather by her ill-advised and dangerous decision to take these three drugs at the same time.

---

[2]  See <u>Drug Summary Tegretol</u>, available at http://www.pdr.net/drug-summary/tegretol?druglabelid=2485&id=946 (visited July 2, 2014); <u>Drug Summary Ativan Tablets</u>, available at http://www.pdr.net/drug-summary/ ativan-tablets?druglabelid=2135 (visited July 2, 2014); <u>Drug Summary Ultram (Tramadol</u> Hydrochloride), available at http://www.pdr.net/drug-summary/ultram?druglabelid= 950&id=1013 (visited July 2, 2014).

Plaintiff also asserts that she can establish her claim of disability discrimination through circumstantial evidence. In order to establish a prima facie case of disability discrimination circumstantially, the plaintiff must adduce sufficient evidence on the following elements: (1) that she is disabled; (2) that she is otherwise qualified for the job, with or without reasonable accommodation; (3) that she suffered an adverse employment action; (4) that her employer knew or had reason to know of her disability, and; (5) that, following the adverse employment action, either she was replaced by a non-disabled person or her position remained open or by showing that similarly situated non-protected employees were treated more favorably. Jones v. Potter, 488 F.3d 397, 404 (6th Cir. 2007).

If the plaintiff satisfies these elements, the employer has an opportunity to offer a legitimate, non-discriminatory reason for its adverse action. If the employer meets this burden of production, the plaintiff must to prove that the employer's reason is pretextual, generally by showing that the reason has no basis in fact, did not actually motivate the employer's decision, or was insufficient to motivate the employer's decision. Id. at 405-06.

In this case, assuming without deciding that Plaintiff can establish a prima facie case of disability discrimination circumstantially, Judson has offered a legitimate non-discriminatory reason terminating her employment, namely her poor disciplinary record which culminated with her violation of the policy on distributing controlled drugs.

Plaintiff, however, has not adduced evidence that Judson's reason for terminating her is a pretext for disability discrimination. The only evidence of pretext that Plaintiff points to is her own testimony that some nurses at Judson distributed

14

controlled drugs without signing them out or by completing the necessary paperwork later without being disciplined or terminated. She also points out that Judson's pharmacist, Therese Njoka, testified that nurses fail to properly sign out medication more than they should and that compliance generally only runs about 70%. As Judson correctly argues in reply, however, Plaintiff has not identified any nurse at Judson who failed to follow the drug distribution policy after Judson tightened up the controls who was not disciplined. Plaintiff admitted in fact that she was unaware of any other nurse who had not complied with the new policy and was not disciplined. Plaint. Dep. at 151.

Additionally, Plaintiff takes Njoka's testimony out of context. Njoka - who is actually an outside reviewer/consultant - did not testify that Judson only experienced a 70% compliance rate with its drug distribution policy. Njoka testified, rather, that she observed a 70% compliance rate with nurses "in general." Njoka Dep. (Doc. No. 22), at 13-14. Njoka also testified, however, that nurses are typically reprimanded when they fail to sign out drugs properly. Id. at 12-13. Njoka also testified that late entry of the drug can be permissible if the nurse can confirm that the drug was given. Id. at 13. Rather than show pretext, Njoka's testimony actually demonstrates that Judson's reason for terminating Plaintiff is not pretextual. First, Njoka's testimony that only 70% of nurses comply with proper drug distribution policies is of no consequence because her testimony is not specific to Judson. Second, however, Njoka's testimony that nurses typically are reprimanded for not following the policy supports Judson's rationale for terminating Plaintiff. Third, and finally, Njoka testimony that nurses can be permitted to "late entry" drugs when they can confirm the drugs were given refutes Plaintiff's

contention that late entry of drugs was tolerated by Judson because she admitted that she does not know what happened to the drugs she signed out.

Plaintiff also contends that Judson cannot prove that she was a direct threat to patient safety, and thus, that it was justified in terminating her on those grounds. As Judson correctly argues, however, the "direct threat" affirmative defense is not at issue in this case. The "direct threat" affirmative defense, codified at 42 U.S.C. § 12113(b), applies when the employer believes that the employee's impairment presents a prospective health or safety threat to others. It does not apply, however, to safety threats that have already actually materialized. See, e.g., Sista v. CDC Ixis North Am., Inc., 445 F.3d 161, 170-71 (2nd Cir. 2006) ("The poses a direct threat defense is not applicable when an employee actually makes a threat[.]") (emphasis in original); Goonewardena v. New York, 475 F. Supp.2d 310, 327 (S.D.N.Y. 2007)("While the direct threat exception may permit an employer to discharge an employee prior to the making of an actual threat, physical or otherwise, once an actual threat has been made the exception is not applicable."). In this case, as Judson points out in its reply brief, it did not terminate Plaintiff because it believed that she presented a future safety risk to its patients due to her impairment. Judson, rather, terminated Plaintiff for past misconduct which posed an actual safety threat to its patients. This section simply is not applicable in this case.

In summary, the record affirmatively establishes that Judson lawfully terminated Plaintiff for misconduct related to her disability. No reasonable juror could find that Judson terminated Plaintiff "because of" her disability. Therefore, Judson is entitled to summary judgment on Plaintiff's disparate treatment discrimination claim.

2. Failure to Accommodate

Plaintiff also alleges that Judson failed to accommodate her disability and, relatedly, failed to fulfill its duty under the implementing regulations to engage in an "interactive process" with her to find a reasonable accommodation for her disability. An employer's failure to provide an accommodation to a disabled employee is a form of disability discrimination if a reasonable accommodation would have permitted the employee to perform all of the essential functions of her job. Keith v. County of Oakland, 703 F.3d 918, 923 (6th Cir. 2013).

Among other requirements, in order to prevail on a failure to accommodate claim, the plaintiff bears the initial burden of requesting an accommodation for her disability and showing that it is objectively reasonable. Talley v. Family Dollar Stores of Ohio, Inc., 542 F.3d 1099, 1108 (6th Cir. 2008). "The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1046-47 6th Cir. 1998). If the employee proposes a reasonable accommodation, the employer has a mandatory duty to engage in an "interactive process" with the employee to attempt to agree on a suitable accommodation. See Rorrer v. City of Stow, 743 F.3d 1025, 1041 (6th Cir. 2014). The employer, however, will not be liable for not engaging in the interactive process if the plaintiff fails to propose a reasonable accommodation. Id. In this case, Judson argues, and the Court agrees, that Plaintiff's failure to accommodate claim fails because Judson actually accommodated her claimed disability and because Plaintiff never requested any other reasonable accommodation.

Plaintiff testified in her deposition that the only accommodation she needed for her TN was an occasional day off work, which she admitted she received whenever she asked. Plaint. Dep. at 209-10. Plaintiff also admitted that she never asked Judson for any other accommodation for her disability. Id. Plaintiff contends now, however, that the accommodation she needed was some additional time off work after the August 22-23 incident in order to adjust to her medications. She also contends that she was too disoriented at the time to ask for additional time off and that Judson should have realized she needed an accommodation. In other words, Plaintiff argues that her need for an accommodation was so obvious that she did not have to ask for one.

Unfortunately for Plaintiff, however, that is not the law in this circuit. As already stated, an employer is not required to speculate whether an employee needs an accommodation. The principal case Plaintiff cites in support of her argument, Brown v. Chase Brass & Copper Co., Inc., 14 Fed. Appx. 482, 487 n.2 (6th Cir. 2001), is contrary to Gantt. In any event, to the extent that Brown supports the proposition that the employer must initiate the interactive process if it is apparent that the employee's disability renders him or her unable to request an accommodation, its discussion on this question is dicta inasmuch as the Court in that case noted that the plaintiff's disability did not impede his ability to request an accommodation. See id. Moreover, even if Plaintiff was too disoriented to request a leave of absence on the night in question, as Judson accurately points out, Plaintiff never asked for a leave of absence in any of the days immediately following the incident when she apparently would have been able to do so. See, e.g. Plaint. Dep. at 123 (testifying that she was able to care for her daughter by herself between August 23 and August 29, when she discontinued taking

18

all three medications). To be sure, Plaintiff was unable to request a leave of absence on the night in question, but she has not shown that she was unable to request a leave of absence within a reasonable time afterwards.

Moreover, Judson also persuasively argues that it was not obvious that Plaintiff's behavior on August 22-23 was a caused by her disability, as opposed to, for instance, a discrete incident involving a potential drug overdose. The record shows that Plaintiff did not have any problems at work when she was taking Tegretol alone and she admitted in her deposition that she had not informed anyone at Judson before her shift started that night that she had changed medications. Plaint. Dep. at 97. Plaintiff also conceded that she had never informed any of her direct supervisors that she has TN. Id. It would have, therefore, taken extraordinary percipience by management and staff at Judson to understand that Plaintiff's behavior that night was caused by a disability that needed accommodating. Accordingly, even if in some circumstances the employer has a duty to propose an accommodation to the employee, as Plaintiff contends, those circumstances were not present in this case.

What Plaintiff really wants as a reasonable accommodation, without expressly saying so, is to have Judson excuse her misconduct in failing to follow the drug distribution policy. An employer, however, is not required to tolerate or excuse disability-related misconduct as a reasonable accommodation to the plaintiff. Parsons v. Auto Club Group, __ Fed. Appx.__, No. 13-2204, 2014 WL 1717025, at *3 (6th Cir. May 2, 2014 McElwee v. County of Orange, 700 F.3d 635, 645-56 (2nd Cir. 2012).

Accordingly, Judson is entitled to summary judgment on Plaintiff's failure to accommodate claim.

B. FMLA Interference Claim

Finally, Plaintiff alleges that Judson interfered with her rights under the FMLA by not granting her leave to address a serious medical condition. This claim fails, however, because Plaintiff never provided notice to Judson that she required FMLA leave. Additionally, as discussed extensively with respect to her disability discrimination claim, Judson terminated Plaintiff for a legitimate reason which was not related the exercise of her rights under the FMLA. Edgar v. JAC Products, Inc., 443 F.3d 501, 508 (6th Cir. 2006); Brohm, 149 F.3d at 523.

Accordingly, Judson is entitled to summary judgment on Plaintiff's FMLA interference claim.

## Conclusion

For the reasons stated above, Defendant Judson Care Center, Inc.'s motion for summary judgment is well-taken and is **GRANTED**. The complaint is **DISMISSED WITH PREJUDICE. THIS CASE IS CLOSED.**

**IT IS SO ORDERED**

Date July 8, 2014            s/Sandra S. Beckwith
                                               Sandra S. Beckwith
                                        Senior United States District Judge